UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | **x** | |
| | **:** | Case No. _____ |
| OLGA CHAVEZ and ANDREW GARCIA, on behalf of themselves and all others similarly situated, | **:** | |
| | **:** | |
| | **:** | |
| | **:** | CLASS ACTION COMPLAINT |
| *Plaintiff,* | **:** | |
| | **:** | DEMAND FOR JURY TRIAL |
| v. | **:** | |
| | **:** | |
| HUMAN SECURITY, INC., | **:** | |
| | **:** | |
| *Defendant.* | **:** | |
| | **:** | |
| | **x** | |

Plaintiffs OLGA CHAVEZ and ANDREW GARCIA (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendant HUMAN SECURITY INC. ("HSI" or the "Defendant"), for violations of federal and state laws set forth herein in connection with Defendant's unlawful acquisition, aggregation, collection, retention, and use for profit of sensitive information during the applicable statutory period and continuing through the present day ("Class Period").

Plaintiffs make the following allegations based upon personal knowledge as to themselves, as well as upon information and belief and investigation of their counsel as follows:

## **INTRODUCTION**

1. Defendant operates one of the most pervasive and covert consumer surveillance networks on the internet, secretly collecting and monetizing the personal data of hundreds of millions of Americans without their knowledge or consent.

2. Plaintiffs and Class members are millions of Americans who are tracked and have their data secretly collected on over 1,200 websites in order for the owners of those websites to

seek and eliminate the threat of illegitimate visitors – like "bots," which are artificial intelligence or programmatic devices that manipulate consumer marketplaces.  Defendant's business model is premised on a trade: it provides bot-detection and fraud-prevention services to its corporate clients while harvesting the personal data of the human consumers, including Plaintiffs and Class members, who visit those clients' websites.

3.     Defendant's unlawful conduct gives rise to two independent but related theories of liability. First, even setting aside any other purpose, Defendant's bot detection apparatus itself operates through the covert, real-time interception and processing of the personally identifiable information ("PII") of every consumer who visits any of the 1,200+ websites operated by Defendant's clients — including Plaintiffs and Class members — without their knowledge or consent. Every visitor is swept into Defendant's surveillance net simply by arriving at a client website. The data so intercepted includes IP addresses, device identifiers, browser fingerprints, geolocation data, browsing behavior, and highly sensitive information that consumers entrust to the websites they visit. Regardless of the purported justification of bot detection, this indiscriminate, warrantless, non-consensual interception of consumer communications violates federal and state law. Second, separately and independently of its bot-detection function, Defendant commercially exploits the PII it harvests by enabling advertising technology companies — including The Trade Desk, Magnite, and others — to power targeted advertising campaigns directed at consumers without their knowledge or consent (or, in the Defendant's words, provide "high-quality ads [that] align with [user] interests"[1]). This advertising monetization is not a byproduct of bot detection; it is an independent revenue stream that Defendant explicitly cultivates and markets to its advertising clients. Defendant's own published materials, case studies, and

---

[1] https://www.humansecurity.com/platform/solutions/ad-quality/ (last accessed May 5, 2026).

privacy disclosures confirm that the consumer data it collects is used to serve contextual and targeted advertisements and to advance the commercial or economic interests of third parties. Both theories independently support each of the causes of action set forth herein; together, they demonstrate the full scope of Defendant's unlawful scheme.

4.      Defendant uses surreptitious digital tracking methods to digitally collect a slew of sensitive data points on unsuspecting website users.  Defendant brags that it monitors over 20 trillion digital interactions each week across over 3 billion unique devices to provide a "unified platform [which] prevents, detects, and responds to cyberthreats with unparalleled scale, speed, and decision precision to deliver a secure and trustworthy environment for [] compan[ies] and customers."[2]  The work of Defendant is to use mass surveillance and processing of sensitive data such that "real customers, partners, and trusted AI agents move freely, but fraud, abuse, and bad actors can't."[3]

5.      Defendant does this is by providing various types of digital solutions to a plethora of websites across nearly every industry that secretly collect data in the background to protect their customers in those industries from the aforementioned "fraud, abuse, and bad actors."[4]  The problem is that every single consumer who visits the websites of Defendant's customers gets caught in the crosshairs.  Formerly operating under the name "White Ops," Defendant purports to protect over 1,200 brands from cybercrime, yet does so through the covert surveillance of the very consumers those brands serve.

---

[2] https://www.humansecurity.com, (last accessed May 5, 2026).

[3] *Id.*

[4] *Id.*

6.     The secret surveillance and collection of consumer data on over 1,200 websites owned by customers of Defendant defies common notions of decency and privacy – and violates federal, state, and common laws.  Plaintiffs and Class members are among the hundreds of millions of victims of Defendant's invasive privacy practices. They visit one or more of the over 1,200 websites operated by Defendant's customers, where Defendant covertly harvests their personally identifiable information ("PII") and exploits it for advertising, research, and other purposes, without their knowledge or consent.

7.     Plaintiffs, on behalf of themselves and Class members, bring this proposed class action on behalf of all consumers whose PII was acquired, aggregated, collected, retained, and used for profit by Defendant for (i) redress of the injury and damages they suffered and continue to suffer by reason of Defendant's continuing unlawful conduct and (ii) injunctive relief to cease Defendant's multiple violations of law.

## JURISDICTION AND VENUE

8.     This action arises under federal, state, and common law.

9.     With respect to federal law violations, Plaintiffs and Class members seek relief under the Electronic Communications Privacy Act (18 U.S.C. § 2510, *et seq*.), with such relief to include: declaratory, equitable and injunctive relief, as well as a measure of damages (including actual damages, punitive damages and statutory damages), disgorgement of profit, costs of suit, pre- and post-judgment interest and reasonable attorneys' fees and costs, as permitted by statute.

10.     With respect to state and common law violations, Plaintiffs and Class members seek relief for (i) violation of Article I, Section I of the California Constitution, (ii) violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631 and 638.51, violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, (iv) common law

intrusion upon seclusion, and (v) unjust enrichment, with such relief to include: injunctive relief, a measure of damages (including punitive or exemplary damages, as well as statutory and trebled damages), disgorgement of profit into a constructive trust, costs of suit, pre- and post-judgment interest and reasonable attorneys' fees, as this Court deems necessary and proper.

11.     *Subject Matter and Supplemental Jurisdiction.*  Plaintiffs bring this Action under the Electronic Communications Privacy Act (18 U.S.C. § 2510, *et seq.*), such that subject matter jurisdiction is proper under 28 U.S.C. §§ 1331, 1332(d), and 1367.  This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 because Plaintiffs assert claims arising under federal law. Additionally, this Court has supplemental jurisdiction over Plaintiffs' state and common law claims under 28 U.S.C. § 1367 because all of their claims arise from the same facts and circumstances and form part of the same case or controversy.

12.     Additionally, this Court also has subject matter jurisdiction over Plaintiffs' state law and common law claims under the Class Action Fairness Act of 2005 (28 U.S.C. § 1332(d)) ("CAFA").  This Court has subject matter jurisdiction under CAFA because the amount in controversy exceeds the sum of $5,000,000 (exclusive of costs and interest), there are more than 100 putative members of the Class and minimal diversity exists between the litigants, as one or more of the Class members is a different citizen than Defendant.  Namely, Plaintiffs Chavez and Garcia are both domiciled in California whereas Defendant is headquartered in New York.

13.     *Personal Jurisdiction.*  This Court has personal jurisdiction over Defendant because its principal place of business is located in New York.  Additionally, this Court has personal jurisdiction over Defendant because Defendant is registered to do business in New York and a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in New York.

14.    *Venue.*  Venue is proper in this District under 28 U.S.C. §1391(b), (c) and (d), because a substantial portion of the conduct described in this Class Action Complaint was carried out in this District.  Further, Defendant maintains substantial business operations in this District.

## PARTIES

## PLAINTIFFS

### Plaintiff Olga Chavez

15.    Plaintiff Chavez is and was domiciled in Riverside County, California during the Class Period.

16.    During the Class Period, Plaintiff Chavez had a Simplify Copilot browser extension installed on her Google Chrome internet browser while she used her LinkedIn account. Simplify Copilot is a free browser extension that streamlines the job application process by automatically filling out application fields with a user's personal information. Plaintiff Chavez has had the Simplify Copilot browser extension installed since 2017.  Without Plaintiff Chavez's knowledge or consent, Defendant intercepted all of the job application information that Plaintiff Chavez provided to LinkedIn through the Simplify Copilot browser extension through its hidden and zero-pixel technology.  This information included highly sensitive personal information, as well as the fact that Plaintiff Chavez was looking for a new job – which, in itself, is sensitive information.[5]

---

[5] According to Simplify Copilot, it collects the following PII which was collected for both Plaintiffs Chavez and Garcia: first name, maiden name, last name, nickname, CV and other job application date, education and employment information, background checks, self-reported skills and interests, social media login data, IP address, browser and device characteristics, operating system, language preferences, referring URLs, device name, country, location, cookie identifiers, information for analytics and marketing, device geolocation, and other information.  As alleged, all of this PII is collected by Simplify Copilot, intercepted by LinkedIn, and shared with Defendant for the purposes for which it does business sans user consent – including consent of Plaintiffs Chavez and Garcia.

17. Many of Defendant's clients' websites use similar online tracking technology. Through this technology, Defendant's profile of Plaintiff Chavez was populated with specific pages she viewed or the content of her searches, without Defendant Chavez's knowledge or consent. Defendant processed this data and stored it on its storage systems to target Plaintiff Chavez with its business clients' ads and to compile a dossier on Plaintiff Chavez, which she did not consent to.

18. Defendant uses its technology to track Plaintiff Chavez across the internet including on over 1,200 websites. When Plaintiff Chavez visited these websites or used other services operated by a participating business client, Defendant used tracking technology to recognize Plaintiff Chavez as the intended recipient of a targeted advertisement.

19. Defendant and its business clients profited from this data collection apparatus. Defendant's profile on Plaintiff Chavez facilitated real-time bidding for digital ad spaces (on websites, applications, Connected TVs, and elsewhere online) that would ultimately be served to her specifically.

20. Plaintiff Chavez did not consent to Defendant intercepting her PII, assigning and using unique identifiers to track her across internet-enabled services and devices, or intercepting her private communications for profit.

***Plaintiff Andrew Garcia***

21. Plaintiff Garcia is and was domiciled in Sacramento County, California during the Class Period.

22. During the Class Period, Plaintiff Garcia had a Simplify Copilot browser extension installed on his Google Chrome internet browser while he used his LinkedIn account. Plaintiff Garcia has had the Simplify Copilot browser extension installed since 2017. Defendant intercepted

6

all of the job application information that Plaintiff Garcia provided to LinkedIn through the Simplify Copilot browser extension through its hidden and zero-pixel technology. This information included highly sensitive personal information, as well as the fact that Plaintiff Garcia was looking for a new job – which, in itself, is sensitive information.

23. Many of Defendant's clients' websites also use the same online tracking technology. Through this technology, Defendant's profile of Plaintiff Garcia was populated with specific pages he viewed or the content of his searches, without Plaintiff Garcia's knowledge or consent. Defendant processed this data and stored it on its storage systems to target Plaintiff Garcia with its business clients' ads and even to compile a dossier on Plaintiff Garcia, which he did not consent to.

24. Defendant uses its technology to track Plaintiff Garcia across the internet including on over 1,200 websites. When Plaintiff Garcia visited these websites or used other services operated by a participating business client, Defendant used tracking technology to recognize Plaintiff Garcia as the intended recipient of a targeted advertisement.

25. Defendant and its business clients profited from this data collection apparatus; Defendant's profile on Plaintiff Garcia facilitated real-time bidding for digital ad spaces (on websites, applications, Connected TVs, and elsewhere online) that would ultimately be served to him specifically.

26. Plaintiff Garcia did not consent to Defendant intercepting his PII, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting his private communications for profit.

7

## DEFENDANT

### *Defendant HUMAN Security Inc.*

27.    Defendant HUMAN Security Inc. is a Delaware corporation headquartered in New York, New York located at 841 Broadway, 2nd Floor, New York, New York 10003.

28.    Defendant publicly touts itself as the global leader in what it calls "Agentic Trust" — a term it uses to describe the discipline of governing how humans, bots, and Artificial Intelligence (AI) agents interact online. According to its own online branding materials, Defendant has "specialized in understanding and mitigating synthetic traffic risk at internet scale" for over a decade, claims to protect "the world's largest brands, advertising systems, and commerce networks," and boasts that it "analyzes over a quadrillion digital interactions each year to distinguish legitimate activity from fraud, abuse, and automated manipulation." Defendant describes its product as "a unified trust layer for the agentic era — bridging security, marketing, and media" across a network spanning billions of devices and trillions of weekly interactions.[6]

29.    What Defendant does not publicize is the other side of that equation: that the "behavioral signal networks" powering this surveillance infrastructure are built, maintained, and monetized using the personal data of hundreds of millions of unaware consumers — including Plaintiffs and Class members — who never agreed to be part of it. Defendant's self-styled mission to create a "trustworthy environment" for its corporate clients is achieved by doing the opposite for the consumers those clients are supposed to serve: stripping them of their privacy, intercepting their communications, and converting their personal data into a commercial asset without their knowledge or consent.

---

[6] https://www.linkedin.com/company/humansecurityinc/about/, (last accessed May 5, 2026).

**FACTUAL ALLEGATIONS**

*Background of Digital Tracking*

30.     Over the last decade, consumers have become acutely aware of the value — and vulnerability — of their personal data online. That awareness has been hard-won: forged by a relentless cycle of high-profile data breaches exposing millions of Americans' sensitive information, and by the creeping, ubiquitous experience of being tracked, profiled, and microtargeted by online advertising that seems to know more about them than they have ever knowingly disclosed.

31.     Consumer facing digital businesses see bots as a legitimate problem.

32.     However, invading a consumer's privacy to ascertain whether they are a bot clashes with legal protections intended to enable consumers to have their information protected when they visit digital spaces, including those of Defendant's clients.  Consumers often supply very sensitive information to the websites that they visit – and this information can be weaponized, as it is by Defendant, for other purposes such as digital tracking, third party advertising, and opaque, unapproved forms of consumer research.

33.     It is significantly harder to detect hidden technologies when Consumers use digital marketplaces as opposed to public spaces.  This shift in preferences is not a license to usurp user data by any means necessary.  Consumer-facing businesses in the digital world, like Defendant's 1,200 clients, heavily rely on various tracking mechanisms (like tracking devices, advertising identifiers and third-party cookies) to specifically identify unique individuals who use products and services in order to serve targeted advertisements and take other unapproved actions against these individuals, like Plaintiffs and Class members.  Indeed, consumers should not have to sacrifice their privacy rights at the doorstep of a business that cannot find other ways to control its

9

"bot" problem or which seeks to collect consumer data for other purposes like advertising and targeting.

34.     While Defendant's business is part of an emerging, new industry, the desire of consumers to maintain a reasonable expectation of privacy in the digital world has not changed any more than it has in the physical world.

*Defendant's Bot Detection Apparatus and Covert Data Collection*

35.     Indeed, according to European advocacy group Fairlinked e.V d/b/a "BrowserGate," websites like LinkedIn (and numerous others) who are customers of Defendant implement a zero-pixel-wide (hidden to users) element that sets cookies to intercept internet consumer data without knowledge on over 1,200 websites – including websites used by Plaintiffs and Class members.[7]

36.     According to BrowserGate, Defendant's technology is secretly embedded in thousands of major websites in order to build consumer profiles on every visitor by sending the data to third party servers which distinguish those visitors from bots or other non-human driven traffic.[8]  An example of how this data process works for LinkedIn users appears as follows:

---

[7] https://cybersecuritynews.com/linkedin-code-collects-data/, (last accessed May 5, 2026).

[8] *Id.*



```
1. User opens LinkedIn in a Chrome-based browser
          |
          ▼
2. Webpack loads chunk.905 (~2.7 MB)
          |
          ├──▶ APFC/DNA engine initializes
          |     Collects 48 browser fingerprinting features
          |     (canvas, WebGL, audio, fonts, hardware, network, battery...)
          |
          ├──▶ AED: fetchExtensions()
          |     Fires up to 6,222 fetch() requests to chrome-extension:// URLs
          |     Collects IDs of every installed extension that responds
          |     Fires AedEvent with browserExtensionIds[]
          |
          ├──▶ Spectroscopy: scanDOMForPrefix()
          |     Walks the entire DOM tree
          |     Searches every text node and attribute for "chrome-extension://"
          |     Fires SpectroscopyEvent with browserExtensionIds[]
          |
          ├──▶ HUMAN Security iframe (li.protechts.net, hidden, 0×0 px)
          ├──▶ Merchant Pool script (merchantpool1.linkedin.com)
          └──▶ reCAPTCHA v3 Enterprise
          |
          ▼
3. All data encrypted with RSA public key (apfcDfPK)
          |
          ▼
4. Transmitted to:
     https://www.linkedin.com/li/track
     /platform-telemetry/li/apfcDf
     /apfc/collect
          |
          ▼
5. Encrypted fingerprint stored on globalThis.apfcDf
     Injected as HTTP header into every subsequent API request
     LinkedIn receives the fingerprint with every action you take
```

37.    This shows that data and various actions taken by a user on a website (here, LinkedIn) are collected through "hidden" and zero-pixel (non-existent to users) technology by Defendant.

38.    Defendant's own AI-generated chatbot reveals which information that is collected secretly on the website of Defendant's clients. This data includes device/usage data (IP address, device IDs, browser information, operating systems, geographic location), interaction data with websites (which pages a user clicks on or visits, how users end up on certain website pages, when users exit pages, and the time spent on those pages) as follows:



**Lumi**  Not human, but all HUMAN                    ✕

🔵  🎤 Speak with Lumi

Hi, I'm Lumi 👋 your HUMAN Experience Navigator -
here to illuminate the path through our products and
insights. What can I help you with today?

> What data does HUMAN collect from
> visitors of websites

HUMAN may collect device/usage data (IP, device
IDs, browser/OS, country/state), interaction data
(pages/clicks, referrer/exit URLs, time), plus
cookies/pixels; details: privacy policy. Are you asking
about HUMAN's own site, or a customer site using
HUMAN?

39.     Collectively, these data points not only reveal exactly who users are, but what they are doing on a respective website.  It also allows Defendant and Defendant's clients to make assumptions about a respective user.  For example, the operating system a respective user utilizes is highly revealing because, generally, wealthier internet users use Apple's iOS operating system as opposed to an Android system.  Additionally, geographic location is an essential tool because it allows assumptions to be made about the demographics of a given user based off where they access a given website – including where they may live, where they may work, and if they are in proximity to one of Defendant's customers' stores.

12

40.    Indeed, Defendant's own AI-generated chatbot states that it collects "mostly technical and behavioral signals" as well as "how a session navigates" by a respective user to ascertain whether bot defense is necessary, as follows:



41.    Disturbingly, Defendant also tracks users using "cross-site" tracking, which means that it collects data on respective users on numerous websites and collates it in order to provide services to its clients.  Defendant's AI-chatbot confirms this:

13

Are you mainly worried about tracking across sites,
or what's collected on a single site session?

tracking across sites

For cross-site tracking, HUMAN's policy notes
cookies/similar tech may collect info about sites
visited before/after a visit, and ads
accessed/seen/clicked, to support analytics and
customized content/ads. Details and opt-out rights

42.     When consumers use digital storefronts, they should be afforded the same privacy as if they walked into an actual store.  Essentially, Defendant's tracking mechanism is the equivalent of being spied upon while walking through a public square with multiple stores – collecting sensitive data on the respective consumer not just as they walk from store to store, but as they reach into their pocket for their phone, or on their drive home.

43.     Over 1,200 different websites use this technology, which is a severe invasion of the privacy rights of any online consumer who visits these websites.  Some of these websites sell highly sensitive items and can also lead to very sensitive conclusions about a person's demographics.  For example, LinkedIn is a customer of Defendant.  Plaintiffs input their personal information, address, other location information, work history, financial/salary requests, information about previous occupations into LinkedIn under the assumption that they were not being tracked – but they were.  Defendant then makes it its business to combine this information as well as other sensitive information from each of their customers' websites through "cross-tracking" to categorize consumers for purposes they did not and would not consent to.

44.     According to Defendant, the purposes for the data it collects on respective consumers include:

a.  Service providers' operational purposes;

b.  Auditing consumer interactions on websites;

c.  Bug detection and error reporting;

d.  Customizing content that service providers display (*e.g.* contextual advertisements);

e.  Improving existing services and developing new products (through researching consumer behavior);

f.  Other users that advance commercial or economic interests, including third party advertising; and

g.  Other uses "about which we notify you."

45.   However, visitors to the websites of Defendant's customers never have any consciousness or awareness of Defendant creepily peering over their digital shoulders – which is why the code, for example, on LinkedIn (which is one of Defendant's customers) is hidden and has zero-pixel qualities.  Defendant has opt-out mechanisms, but unfortunately, a consumer cannot opt-out of secret data tracking without knowing it is taking place.

46.   Defendant hails the speed of its digital apparatus as well as its use of AI to evaluate consumer data without consent.  As Defendant states, its "HUMAN Decision Engine examines 2,500-plus signals per interaction" which means it analyzes over 2,500 data points with each interaction on Defendant's customers' websites.[9]  Additionally, it states that it uses those "signals from throughout the customer journey [which] are analyzed by 400-plus algorithms and adaptive

---

[9] https://www.humansecurity.com/advertising/, (last accessed May 5, 2026).

15

machine-learning models."[10]  At scale, "HUMAN verifies more than 20 trillion digital interactions weekly across 3 billion unique devices."[11]

47.    Defendant's surveillance apparatus does not operate as a one-time collection that occurs at the moment a user loads a webpage and then ceases. To the contrary, Defendant's technology converts each user's browser session into a persistent, ongoing surveillance stream in which the same source-identifying values are attached to every subsequent request the user makes during that session.

48.    Defendant's technology is specifically designed to prevent users from detecting this surveillance. The zero-pixel, hidden elements through which Defendant's code operates are invisible to users. Defendant's code executes in the background during browser idle time or in parallel with ordinary page rendering, producing no visible indication of its activity. None of Defendant's acts are with the adequate consent or knowledge of Plaintiffs and Class members.

49.    An example of how companies use Defendant's data collection apparatus involves a digital advertising company called Magnite.  According to Defendant's own case study, "Magnite is the largest independent sell-side advertising platform.  They help premium publishers monetize CTV, online video, display ads, mobile web and in-app audio, and digital out-of-home – through ad serving [for] the world's leading agencies and brands."[12]  Essentially, Magnite uses the data that Defendant provides to assure the brands that use Magnite for digital advertising that the consumers that they are targeting are actual consumers and not bots or people committing

---

[10] *Id.*

[11] *Id.*

[12] https://www.humansecurity.com/wp-content/uploads/2025/12/HUMAN_Case-Study_Magnite.pdf, (last accessed May 5, 2026).

fraud. The only way to do this, however, is to use a massive amount of data to confirm the legitimacy of these "real" customers.

50.    As Magnite and Defendant jointly say in their case study, "[a]s threats evolve and the advertising landscape shifts, Magnite focuses on velocity: doing more, faster, and with the right [consumer] data and insights to support every move. With HUMAN as a trusted partner, Magnite continues raising the bar on inventory quality [for advertisements], promoting a marketplace where [advertising] buyers get the outcomes they pay for and [advertising] sellers compete on the true value of their project."[13] Magnite's targeted advertising, which is powered by collecting consumer data, is made even more effective for its clients because Defendant's secret collection of even more data makes Magnite's advertising marketplace even more lucrative.

51.    LinkedIn's data collection 51.in connection with Defendant's services is particularly egregious. LinkedIn uses secret code to scan for browser extensions installed on Google Chrome browsers in order to acquire highly sensitive information which eventually ends up in the hands of Defendant. Specifically, LinkedIn gains access to software modules that allow it to seek and search for information about LinkedIn's users to profile them based on the actions that a respective user has taken within a Google Chrome browser, including:[14]

      a.  *Political opinions* (including searches for "anti-woke," "anti-zionist" and anti-Elon Musk actions within a browser window);

      b.  *Religious beliefs*;

      c.  *Disability and neurodivergence*;

      d.  *Employment status*; and

---

[13] *Id.*

[14] https://browsergate.eu/executive-summary/, (last accessed May 5, 2026).

e. *Trade secrets*.

52. The value of, and potential harm in collecting, this type of data in an employment context was revealed in "digital redlining" civil rights cases against Meta/Facebook. Civil rights organizations including the National Fair Housing Alliance, the ACLU, and the Communications Workers of America challenged Facebook's advertising platform through a combination of federal litigation and administrative charges, alleging that its microtargeting tools enabled employers and advertisers to exclude users based on protected characteristics such as gender and age. These actions, along with investigations by regulators and journalists, demonstrated that Facebook's ad platform could be used to prevent protected classes from receiving housing, employment, and credit advertisements. In March 2019, Facebook cited these "valid concerns" and announced sweeping changes to its advertising systems in response to these claims. In particular, Facebook "removed thousands of categories from targeting related to protected classes such as race, ethnicity, sexual orientation and religion", but noted that it still needed to "do better."[15]

53. Defendant admits that it monitors an incredible amount of consumer data, stating "HUMAN is a leading cybersecurity company committed to protecting the integrity of the digital world" but the problem is that it does not protect the integrity of consumers in the digital world.[16] Defendant continues, "[w]e ensure that every digital interaction, transaction, and connection is authentic, secure, and human. HUMAN verifies 20 trillion digital interactions, providing unparalleled telemetry data to enable rapid effective responses[.]"[17]

---

[15] Press Release, Facebook, *Doing More to Protect Against Discrimination in Housing, Employment and Credit Advertising* (Mar. 19, 2019), https://about.fb.com/news/2019/03/protecting-against-discrimination-in-ads, (last accessed May 5, 2026).

[16] https://www.humansecurity.com/wp-content/uploads/2025/12/HUMAN_Case-Study_Magnite.pdf, (last accessed May 5, 2026).

[17] *Id.*

18

54.    All of this requires a massive amount of consumer data; consumer data acquired without proper consent.

*The Quantifiable Value of Plaintiffs' and Class Members' Data*

55.    The PII, other sensitive information and assumptions made by AI are highly valuable.

56.    Consumers with reasonable privacy expectations online do not get adequately and justly compensated for the data that enriches Defendant and its advertising, and other, business customers.  The significant value of a consumer's data is not matched by the transactions that Defendant and business customers make between themselves.  Commenting on digital message board or applying to an online job post does not actually or tacitly create permission for Defendant to monetize that data, even for the purported purpose of cybersecurity.  Even if such usage constituted consent, this does not justly compensate online users for their data nor the privacy rights they give up due to Defendant's unlawful privacy practices.

*Plaintiffs and Class Members Have a Reasonable Expectation of Privacy*

57.    Internet users, like Plaintiffs and Class members, do not expect to be tracked across every single one of their internet-connected devices, including on their web browsers, internet-enabled applications, connected TVs, and more.

58.    Surveys regarding online privacy reinforce this.  For example, in a study by Flurry Analytics, 88% of Apple device users worldwide availed themselves of "Do Not Track" features in the hopes that their privacy rights would be protected.[18]

---

[18] See Flurry Analytics, *iOS 14.5 Opt-In Rate — Weekly Updates Since Launch* (May 2021), https://www.flurry.com/blog/ios-14-5-opt-in-rate-idfa-app-tracking-transparency-weekly/, (last accessed May 5, 2026).

19

59.     Plaintiffs and Class members had no cognizance of and did not expect that Defendant would circumvent these protections and the desire of online consumers to remain anonymous.

60.     Defendant is relatively unknown to almost every single user for whom it holds a data profile.  By no means is "HUMAN Security Inc." a household name.  Even so, Defendant made no effort to avail itself to the consumers it tracks or tracked, and there is no way Plaintiffs and Class members would have knowingly been tracked by this unknown company, let alone been aware that it targeted them across online services for profit.

61.     Defendant did not have adequate consent to perform this type of omni-present, cross-device tracking using Plaintiffs' and Class members' unique identifiers, PII and other sensitive information.

62.     It is recognized that this information is highly valuable – and is even more valuable given that it has resale value and value for training AI and other algorithms.  Indeed, this data is instrumental to updating and improving Defendant's AI and other algorithms that identify and target unique users with advertisements.

### *The Harm Defendant Causes to Plaintiffs*

63.     The harm caused by Defendant is multifaceted.

*64*.     Defendant violates a fundamental right to privacy that consumers have online. When a consumer enters a digital space – such as an online retail storefront or pharmacy – that consumer reasonably expects that they have the same privacy rights in that digital storefront or pharmacy as they would at a brick-and-mortar storefront or pharmacy.  Defendant willingly and intentionally violates these privacy rights to profit from the data they can extract by peering over the digital shoulders of each consumer.

65.     Further, the data collected from Plaintiffs and Class members is highly valuable. Defendant would not have built their highly profitable business on the transaction of this data and there would not be an entire data aggregation industry if this data had no tangible value.  However, Defendant does not adequately compensate Plaintiffs and Class members for the data that they collect, retain, sell and profit from.  Defendant only states that the value that Plaintiffs and Class members achieve from this scheme is that it helps each consumer better be served by digital advertising.

66.     Taken together, the deprivation of privacy rights and the failure to compensate Plaintiffs and Class members for their data intentionally causes substantial harm to millions of Americans.

### *Tolling and Concealment*

67.     The earliest moment in time when Plaintiffs and Class members could have discovered Defendant's conduct was shortly before the filing of this Action.  Plaintiffs became aware of Defendant's conduct through communications with counsel which are protected from disclosure.

68.     Plaintiffs and Class members, despite their due diligence, could not have discovered Defendant's conduct due to (i) how Defendant's technology works, (ii) Defendant's lack of adequate disclosures and (iii) the failure of Defendant to inform Plaintiffs and Class members that it was maintaining a data profile on each member of the Class.

69.     Defendant's interception of unique identifiers, including PII and other sensitive information, as well as the assumptions made by Defendant's AI, happens inconspicuously in the background.  This process is undetectable to an ordinary person; it is highly technical, and it prevents Plaintiffs and Class members from discovering it.

70. Defendant had exclusive knowledge that Defendant's technology (as well as the technology used by Defendant's subsidiaries, business customers, and contracted data aggregators) were tracking Plaintiffs and Class members across the internet.

71. Defendant was under a duty to disclose the nature and significance of its data interception and use practices – especially considering its problematic false public statements – but did not do so. Defendant, therefore, is estopped from relying on any statute of limitations by virtue of the discovery rule and doctrine of fraudulent concealment.

## CLASS ACTION ALLEGATIONS

72. This Action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23, Rules 23(a), 23(b)(1), 23(b)(2) and 23(b)(3). Plaintiffs bring this class action on behalf of themselves and all other similarly situated individuals. The nationwide class Plaintiffs seek to represent is defined as follows:

> **Nationwide Class.** All natural persons in the United States for whom Defendant aggregated, collected, retained, sold or otherwise profited from their PII or other sensitive information.

73. In the alternative to the nationwide class, Plaintiffs seek to represent the following statewide sub-class pursuant to Federal Rules of Civil Procedure, Rules 23(a) and 23(b)(3):

> **California State Sub-Class.** All natural persons in the State of California for whom Defendant aggregated, collected, retained, sold or otherwise profited from their PII or other sensitive information.

74. Excluded from the Classes are (1) Defendant and Defendant's subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; (2) Plaintiffs' counsel; and (3) all judges assigned to hear any aspect of this litigation as well as their immediate family members.

22

75.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

76.     *Numerosity.*  Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of Defendants or others.  Plaintiffs believe that, due to the nature of the trade and commerce involved, there are millions of Class members geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

77.     *Typicality.*  Plaintiffs' claims are typical of those of other Class members because Plaintiffs, like every other Class member, were harmed by way of the unlawful privacy-violating conduct as alleged herein.  Plaintiffs, like all other Class members, were injured by Defendant's uniform conduct.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, such that there are no defenses unique to Plaintiffs.  The claims of Plaintiffs and those of the other Class members arise from the same operative facts and are based on the same legal theories.

78.     *Commonality.*  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members.  These common questions of law and fact include, without limitation:

    i.   Whether Defendant violated Plaintiffs' and the Classes' privacy rights;

    ii.   Whether Defendant's acts and practice violate the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 638.51;

    iii.   Whether Defendant's acts and practices violate the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200;

    iv.   Whether Defendant's acts and practices violate the California Constitution, Article I, Section 1;

23

v.   Whether Defendant's acts and practices constitute common law intrusion upon seclusion;

vi.  Whether Plaintiffs and Class members are entitled to damages and/or equitable relief, including injunctive relief, restitution, and disgorgement of profit into a constructive trust;

vii. Whether Defendant was unjustly enriched; and

viii. The appropriate class-wide measure of damages as well as whether Plaintiffs and Class members are entitled to such damages and other relief.

79.   *Adequacy of Representation.*   Plaintiffs will (and have) fairly and adequately represent and protect the interests of the Class members in that they have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class.  The damages and infringement of rights that Plaintiffs suffered are typical of other Class members, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class. Plaintiffs have retained counsel experienced in data privacy class action litigation, and Plaintiffs intend to prosecute this action vigorously.

80.   *Superiority of Class Action.*   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class' common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts.  In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

81.    The litigation of the claims brought herein is manageable.  Defendant's uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

82.    Adequate notice can be given to Class members directly using information maintained in the parties' records.

83.    *Predominance.*  The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

84.    This proposed class action does not present any unique management difficulties. Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT

### 18 U.S.C. § 2510, et seq.

### ON BEHALF OF THE NATIONWIDE CLASS

85.    Plaintiffs reallege and repeat each and every allegation from the preceding paragraphs as if fully realleged and set forth herein.

86.    The Electronic Communications Privacy Act ("ECPA") makes it illegal to intentionally intercept, or attempt to intercept, any wire, oral, or electronic communication and to disclose or use the contents of an unlawfully intercepted communication. 18 U.S.C. § 2511.

87.    ECPA provides a private right of action to any person whose electronic communications are intercepted. 18 U.S.C. § 2520(a).

88.    Defendant intentionally intercepted electronic communications that Plaintiffs and the Class members exchanged with Defendant through the tracking tools installed on Defendant's business customers' websites.

89.    The transmission of data between Plaintiffs and the Class members and Defendant qualifies as communications under ECPA. 18 U.S.C. § 2510(12).

90.    Defendant contemporaneously intercepted and transmitted Plaintiffs' and the Class members' communications of that data to the advertising technology companies whose trackers Defendant installed or allowed to be installed on its clients' websites.

91.    The tracking mechanisms that Defendant uses to track Plaintiffs' and the Class members' communications, Plaintiffs' and the Class members' browsers, Plaintiffs' and the Class members' computing devices, and the code that Defendant placed or allowed to be placed on its clients' websites, are all "devices" within the meaning of 18 U.S.C. § 2510(5).

92.    The online companies that are the recipients of communications between Plaintiffs and Class members, on the one hand, and Defendant, on the other, are not party to those communications.

93.    Defendant transmits the contents of those communications through the surreptitious redirection of the communications from Plaintiffs' and the Class members' computing devices.

94.    Plaintiffs and Class members did not consent to the advertising technology companies' acquisition of their communications with Defendant.  Nor did the advertising technology companies receive legal authorization to receive such communications.

95.    In disclosing the content of Plaintiffs' and Class members' communications, Defendant had a purpose that was tortious and designed in a manner that violates statutory and constitutional privacy provisions including:

26

a. The unauthorized disclosure of PII, which is tortious regardless of whether the means deployed to disclose the information violates the ECPA or any subsequent purpose or use;

b. Intrusion upon Plaintiffs' and the Class members' seclusion; and

c. Trespass upon Plaintiffs' and the Class members' personal and private property.

96. Defendant acted with intent to defraud in that it willfully invaded and took Plaintiffs' and Class members' property, including the property rights to their PII and their right to determine whether such information remains confidential; the right to determine who may collect and use such information for marketing; and the right to determine who has access to their devices and communications. Defendant's scheme or artifice to defraud consists of the false and misleading statements in its privacy policy described herein.

97. Defendant also acted with intent to defraud in that it willfully invaded and took Plaintiffs' and Class members' property (their PII) with knowledge that it lacked consent or authorization to do so; a reasonable consumer would not understand that Defendant was collecting and transmitting their data to third parties; a reasonable consumer would be shocked to realize the extent of Defendant's disclosure of data to third parties; and the subsequent use of personal information for marketing or commercial purposes constituted a further unauthorized invasion of privacy.

98. Defendant acted with the intent to acquire, use, and disclose Plaintiffs' and Class members' PII without their authorization or consent.

99. Plaintiffs and Class members have suffered damages because of Defendant's violations of ECPA, including that (1) Defendant eroded the essential, confidential nature of the relationship between Defendant and its customers, (2) Defendant failed to provide Plaintiffs and

27

Class members with the full value of the services for which they paid, which included a duty to maintain confidentiality and protect privacy, (3) Defendant derived valuable benefits from using and sharing Plaintiffs' and Class members' communications without their knowledge or informed consent and without providing compensation, (4) Defendant's actions deprived Plaintiffs and Class members of the value of their PII, (5) Defendant's actions diminished the value of Plaintiffs' and Class members' property rights in their PII; and (6) Defendant violated Plaintiffs' and Class members' privacy rights by sharing their PII for commercial use.

100.    Plaintiffs and Class members seek appropriate declaratory or equitable relief including injunctive relief, actual damages and profits enjoyed by Defendant because of violations or the appropriate statutory measure of damages, punitive damages, and reasonable attorneys' fees and costs. 18 U.S.C. § 2520.  Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class members seek monetary damages for the greater of (i) the sum of the actual damages suffered by the plaintiff and any profits made by Defendant because of the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

<u>**SECOND CAUSE OF ACTION**</u>

**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**

**Cal. Penal Code § 631 — Wiretapping ("CIPA")**

**ON BEHALF OF THE CALIFORNIA STATE SUB-CLASS**

101.    Plaintiffs reallege and repeat each and every allegation from the preceding paragraphs as if fully realleged and set forth herein.

102.    CIPA § 631 prohibits any person who, by means of any "machine, instrument or contrivance" or in "any other manner": (1) intentionally taps or makes an unauthorized connection with "any telegraph or telephone wire, line, cable or instrument;" (2) willfully and without consent

28

of "all parties to the communication" or in "any unauthorized manner" reads or "attempts to read" or "learns the contents or meaning of any message, report or communication while the same is in transit or passing over any wire, line or cable, or is being sent from, or received at any place" within California; (3) "uses or attempts to use, in any manner, or for any purposes, or to communicate in any way" information so obtained; or (4) aiding, agreeing, employing or conspiring with "any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

103.    Defendant is a person under CIPA § 631.

104.    Defendant intercepted Plaintiffs' and Class members' unique identifiers and other personal data and private communications while "in transit or passing over any wire, line or cable or is being sent from, or received from any place within" California.

105.    At all relevant times, Defendant used its technology to make unauthorized connections with the lines of communication and instruments used by Plaintiffs and Class members to access online services without the consent of all parties to those communications.

106.    Defendant willfully, and without consent, read, or attempted to read, or learn the contents and meaning of Plaintiffs' and Class members' communications with online services while those communications were in transit or passing over a wire, line, or cable, or were being sent or received within California through its tracking technology, as described herein.  This interception happens prior to or at the same time that they would be received by the intended recipient.

107.    Defendant used and attempted to use these identifiable, private communications without consent for its own benefit, including for targeted advertising.

29

108.    Plaintiffs and Class members have been harmed because of Defendant's conduct. Their PII and sensitive information has been intercepted, viewed, and used for "bot" detection, cybersecurity, targeted advertising and has not been destroyed.  Plaintiffs and Class members face an imminent threat of continued injury, as this data is still stored and used, such that Plaintiffs and Class members have no adequate remedy at law.

109.    Plaintiffs and Class members seek statutory damages in accordance with CIPA § 637.2(a) which provides the greater of: (1) $5,000 per violation or (2) three times the amount of damages suffered by Plaintiffs and Class members in an amount to be proven at trial, as well as equitable and injunctive relief.

### THIRD CAUSE OF ACTION

**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")**

**Cal. Penal Code § 638.51 — Unlawful Installation or Use of a Pen Register**

**ON BEHALF OF THE CALIFORNIA STATE SUB-CLASS**

110.    Plaintiffs reallege and repeat each and every allegation from the preceding paragraphs as if fully realleged and set forth herein.

111.    California Penal Code § 638.51 makes it unlawful for any person to install or use a pen register or a trap and trace device without first obtaining a court order. "Pen register" is defined to include any device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted. Cal. Penal Code § 638.50(b). A "trap and trace device" is any device or process that captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication. Cal. Penal Code § 638.50(c).

30

112. Defendant's tracking technology constitutes a pen register and/or trap and trace device within the meaning of Cal. Penal Code § 638.50. Specifically, Defendant's tools record and decode the dialing, routing, addressing, and signaling information transmitted by consumers' internet-connected devices, including the origin and destination of every digital communication made by Plaintiffs and Class members across each of the 1,200+ websites where Defendant's tracking code is embedded. By logging which websites a user visits, which pages they navigate to, and the sequence and timing of their online activity, Defendant's technology captures precisely the type of routing and addressing information that pen register statutes are designed to protect.

113. Defendant installed and used these pen register and trap and trace devices without obtaining any court order authorizing their use, as required by Cal. Penal Code § 638.51.

114. Plaintiffs and Class members did not consent to the installation or use of pen register or trap and trace devices by Defendant on their internet-connected devices and communications.

115. Defendant's installation and use of pen registers and trap and trace devices to track and record Plaintiffs' and Class members' digital communications without a court order constitutes a violation of Cal. Penal Code § 638.51.

116. Plaintiffs and Class members have been harmed by Defendant's violations of Cal. Penal Code § 638.51. The routing and addressing data that Defendant captured reveals the full mosaic of each consumer's online life — their interests, habits, relationships, health concerns, political views, and financial circumstances — without their knowledge or consent.

117. Plaintiffs and Class members seek statutory damages in accordance with CIPA § 637.2(a), which provides the greater of: (1) $5,000 per violation or (2) three times the amount of

31

damages suffered by Plaintiffs and Class members in an amount to be proven at trial, as well as equitable and injunctive relief.

### FOURTH CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA CONSTITUTION

### Article I, Section 1 — Right to Privacy

### ON BEHALF OF THE CALIFORNIA STATE SUB-CLASS

118. Plaintiffs reallege and repeat each and every allegation from the preceding paragraphs as if fully realleged and set forth herein.

119. The California Constitution expressly recognizes "privacy" as an inalienable right. Cal. Const. Art. I, § 1. This provision creates a legally enforceable right of privacy against private parties and gives rise to a private right of action. *Hill v. NCAA*, 7 Cal.4th 1 (1994). To state a claim, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) a serious invasion of that privacy interest by the defendant's conduct.

120. Plaintiffs and Class members have a legally protected privacy interest in their PII, including their communications, browsing activity, device identifiers, geolocation data, employment information, and other sensitive information that Defendant covertly collects. California recognizes both informational privacy interests (protecting against the misuse of personal data) and autonomy privacy interests (protecting individual decision-making free from coercion or surveillance). Both are implicated here.

121. Plaintiffs and Class members had a reasonable expectation of privacy in their personal information and online communications. As described herein, Defendant's tracking technology is designed to be undetectable. Consumers visiting websites that use Defendant's

32

technology have no means of knowing that their browsing activity is being intercepted, logged, and transmitted to a third-party surveillance company. The zero-pixel, hidden nature of Defendant's implementation — deliberately designed to evade consumer awareness — confirms that a reasonable person in Plaintiffs' and Class members' position would not expect to be tracked. Indeed, 88% of Apple device users globally have invoked Do Not Track protections, demonstrating the reasonable expectation that online activity will not be covertly harvested.

122.    Defendant's conduct constitutes a serious invasion of Plaintiffs' and Class members' privacy interests. The covert, cross-site, cross-device collection of PII at the scale Defendant conducts it — spanning over 1,200 websites, analyzing 2,500-plus signals per interaction, and processing 20 trillion digital interactions per week — is not a trivial or incidental intrusion. It is an industrialized surveillance operation that vacuums up the intimate details of millions of Americans' daily digital lives and converts them into commercial commodities without consent.

123.    Plaintiffs and Class members have suffered harm as a direct result of Defendant's violations of their constitutional right to privacy, including the loss of control over their personal information, the commercial exploitation of their private data without compensation, and the ongoing risk of further disclosure and use of their intimate personal details.

124.    Plaintiffs and Class members are entitled to compensatory and punitive damages, injunctive relief, restitution, and such other relief as the Court may deem proper.

**FIFTH CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")**

**Cal. Bus. & Prof. Code § 17200, et seq.**

**ON BEHALF OF THE CALIFORNIA STATE SUB-CLASS**

125.    Plaintiffs reallege and repeat each and every allegation from the preceding paragraphs as if fully realleged and set forth herein.

126.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. A business practice need satisfy only one of the three prongs to violate the UCL. Defendant's conduct violates all three.

127.    Unlawful Prong.  Defendant's conduct is "unlawful" because it violates ECPA (18 U.S.C. § 2511), CIPA § 631, CIPA § 638.51, and Article I, Section 1 of the California Constitution, as alleged in the First through Fourth Causes of Action herein. The UCL borrows these violations as independently sufficient predicates for "unlawful" conduct.

128.    Unfair Prong.  Defendant's conduct is "unfair" because the gravity of the harm to Plaintiffs and Class members — the covert, large-scale interception and commercial exploitation of their PII — substantially outweighs any utility to Defendant's bot-detection services. Defendant's conduct also offends public policy as reflected in California's comprehensive privacy statutes and constitutional protections. No consumer visiting any of the 1,200+ websites where Defendant's code is embedded would knowingly consent to the scope of surveillance Defendant conducts, or to having their most sensitive personal data sold to advertising technology companies for commercial gain. This imbalance of power and information is precisely the type of conduct the UCL was designed to address.

34

129. Fraudulent Prong.   Defendant's conduct is "fraudulent" because Defendant's privacy disclosures are misleading and likely to deceive members of the public. Defendant publicly markets itself as a cybersecurity company committed to "protecting the integrity of the digital world" and providing "authenticity" and "trust" in digital interactions. These representations are false and misleading because they conceal the fact that Defendant is simultaneously harvesting and commercially exploiting the personal data of the very consumers it claims to protect. A reasonable consumer would be deceived by Defendant's public representations into believing that Defendant's relationship to consumers is protective rather than predatory.

130. Plaintiffs and Class members have suffered injury in fact and lost money or property as a result of Defendant's unfair, unlawful, and fraudulent conduct. Specifically, Plaintiffs and Class members lost the value of their personal data, which Defendant appropriated without compensation, and lost the benefit of the privacy protections to which they were entitled.

131. Plaintiffs and Class members are entitled to restitution and disgorgement of Defendant's ill-gotten profits, as well as injunctive relief preventing Defendant from continuing its unlawful, unfair, and fraudulent business practices. Cal. Bus. & Prof. Code §§ 17203, 17204.

**SIXTH CAUSE OF ACTION**

**COMMON LAW INTRUSION UPON SECLUSION**

**ON BEHALF OF THE NATIONWIDE CLASS**

132. Plaintiffs reallege and repeat each and every allegation from the preceding paragraphs as if fully realleged and set forth herein.

133. California and New York common law recognize intrusion upon seclusion as an actionable invasion of privacy. *Shulman v. Group W Productions, Inc.*, 18 Cal.4th 200, 229 (1998); *Nader v. General Motors Corp.*, 25 N.Y.2d 560, 565 (1970). The tort consists of (1) an intentional

35

intrusion (2) into a private sphere of the plaintiff's life (3) in a manner that would be highly offensive to a reasonable person. The intrusion need not involve physical trespass; it encompasses electronic and digital means of surveillance.

134.   Plaintiffs and Class members have a legally recognized private sphere encompassing their personal information, online communications, browsing activity, device usage, geolocation data, employment information, and other sensitive personal data that they provide to and generate in connection with websites they visit. This information is private: consumers have a reasonable expectation that it will not be covertly intercepted by an unknown third-party company and exploited for commercial purposes.

135.   Defendant intentionally intruded into this private sphere. The zero-pixel, hidden tracking technology that Defendant deploys is designed specifically to penetrate the private digital space of consumers without detection. This is not an inadvertent collection of data in the ordinary course of providing a service; it is deliberate covert surveillance designed to go unnoticed.

136.   Defendant's intrusion would be highly offensive to a reasonable person. A consumer who learned that an unknown company was recording their every online action — every page visited, every search conducted, every link clicked — across over 1,200 websites, combining that data with their employment history, political inclinations, geolocation, and device fingerprint, and selling the resulting profile to advertising companies without ever disclosing this practice, would be deeply offended. The covert, pervasive, and commercially motivated nature of Defendant's surveillance goes far beyond what any reasonable person would expect or accept.

137.   Defendant acted intentionally and with knowledge that its conduct constituted an intrusion into Plaintiffs' and Class members' private sphere, as evidenced by the deliberate design

36

of its zero-pixel tracking technology, its awareness of and marketing toward advertising clients, and its own disclosures regarding the types of sensitive data it collects.

138.   Plaintiffs and Class members have suffered harm as a direct and proximate result of Defendant's intrusion upon their seclusion, including loss of control over their private information, emotional distress from the violation of their privacy, and the commercial exploitation of their personal data without consent or compensation.

139.   Plaintiffs and Class members are entitled to compensatory damages, punitive damages, injunctive relief, and such other relief as the Court may deem proper.

**SEVENTH CAUSE OF ACTION**

**UNJUST ENRICHMENT**

**ON BEHALF OF THE NATIONWIDE CLASS**

140.   Plaintiffs reallege and repeat each and every allegation from the preceding paragraphs as if fully realleged and set forth herein.

141.   Defendant received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

142.   Defendant received benefits from Plaintiffs and Class members in the form of their highly valuable data, including PII, that Defendant wrongfully collected, disclosed and intercepted from Plaintiffs and Class members without authorization and proper compensation.

143.   Defendant collected, disclosed, intercepted, stored, and used this data for their own gain, providing Defendant with economic, intangible, and other benefits, including highly valuable data for analytics, advertising, and improvement of their platforms, algorithms, and advertising services.

144.   Had Plaintiffs and Class members known of Defendant's misconduct, they would not have provided any of their valuable data to the applications or websites which Defendant used for aggregation or would have paid less for the services on those applications or websites.

145.   Defendant unjustly retained these benefits at the expense of Plaintiffs and Class members because Defendant's conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

146.   The benefits that Defendant derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members.  It would be inequitable for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Action.

147.   Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**EIGHTH CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT**

**Cal. Penal Code § 502, et seq.**

**ON BEHALF OF THE CALIFORNIA STATE SUB-CLASS**

148.   Plaintiffs reallege and repeat each and every allegation from the preceding paragraphs as if fully set forth herein.

149.   The California Legislature enacted Cal. Penal Code § 502, the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), to provide protection against "tampering, interference, damage, and unauthorized access to lawfully created computer data and

38

computer systems," finding that "the proliferation of computer technology has resulted in a concomitant proliferation of ... forms of unauthorized access to computers, computer systems, and computer data" and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals." Cal. Penal Code § 502(a).

150.    Defendant violated Cal. Penal Code § 502(c)(1) by knowingly accessing, without permission, the computers and computer systems belonging to Plaintiffs and Class members in order to wrongfully obtain data.

151.    Defendant violated Cal. Penal Code § 502(c)(2) by knowingly accessing, without permission, the computers and computer systems belonging to Plaintiffs and Class members in order to take, copy, and make use of data found therein.

152.    Defendant violated Cal. Penal Code § 502(c)(3) by knowingly and without permission using or causing to be used computer services belonging to Plaintiffs and Class members.

153.    Defendant violated Cal. Penal Code § 502(c)(6) by knowingly and without permission providing advertising technology companies and other third parties with a means of accessing a computer, computer system, or computer network belonging to Plaintiffs and Class members. By building and maintaining the tracking infrastructure through which third parties receive Plaintiffs' and Class members' personal data, Defendant provided those parties with access to data originating from users' computers that those parties could not have obtained independently and that users never authorized them to receive.

154.    Defendant violated Cal. Penal Code § 502(c)(7) by knowingly and without permission accessing or causing to be accessed the computers, computer systems, and computer

39

networks belonging to Plaintiffs and Class members. Each time Defendant's tracking code executes within a user's browser, Defendant accesses that user's computing environment — reading browser state, device characteristics, and session data — without permission.

155.    Defendant also violated Cal. Penal Code § 502(c)(8) by knowingly introducing a computer contaminant into the computers, computer systems, and computer networks of Plaintiffs and Class members. Under § 502(b)(10), a "computer contaminant" means "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Defendant's tracking code satisfies this definition in full.

156.    Plaintiffs and Class members have suffered damage and loss as a result of Defendant's violations of § 502. Their private data has been taken, copied, and transmitted to third parties without consent. They have suffered invasion of privacy, loss of control over their personal information, and the unauthorized use of their computing resources. Plaintiff Chavez and Plaintiff Garcia have expended time and resources investigating the scope of Defendant's conduct and taking protective measures after learning of these violations.

157.    Pursuant to Cal. Penal Code § 502(e)(1), Plaintiffs and Class members are entitled to compensatory damages and injunctive relief. Pursuant to § 502(e)(4), Plaintiffs and Class members are entitled to punitive or exemplary damages because Defendant's conduct was willful, oppressive, and undertaken with conscious disregard for their rights, within the meaning of Cal. Civil Code § 3294. Pursuant to § 502(e)(2), Plaintiffs and Class members are entitled to an award of reasonable attorneys' fees.

**DEMAND FOR RELIEF**

158.    To remedy these illegal acts, Plaintiffs request the following relief:

a.    Certify the Classes and appoint Plaintiffs as the Classes' representatives;

b.    Declaring and adjudging that the conduct of Defendant is unlawful and violates the federal and state law;

c.    Disgorging Defendant's profits from its unlawful data privacy scheme into a constructive trust;

d.    Awarding to Plaintiffs the costs of their suit, including reasonable attorneys' fees;

e.    Awarding to Plaintiffs their damages, in the amount to be determined by a jury, inclusive of statutory and/or treble damages as provided by the applicable federal and state laws;

f.    Awarding restitution and disgorgement of Defendant's unlawfully obtained profits to Plaintiffs and Class members;

g.    Granting permanent injunctive relief requiring Defendant to cease its unlawful data collection, interception, and advertising monetization practices and to delete all unlawfully collected PII;

h.    Granting to Plaintiffs and Class any such other relief to which they may be entitled and which this Court deems just and proper.

**JURY TRIAL DEMANDED**

159.    Plaintiffs demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

Dated: May 5, 2026

Respectfully submitted,

By: */s/    Blake Hunter Yagman*
Blake Hunter Yagman
**YAGMAN PLLC**
Forest Hills Tower
118-35 Queens Boulevard, Suite 400
Forest Hills, New York
Tel.: (929) 709-1493
blake.yagman@yagmanpllc.com


Lina Kaisey (PHV Forthcoming)
**LAW OFFICES OF LINA KAISEY**
100 Wilshire Boulevard, Suite 700
Santa Monica, California 90401
Tel: (213) 927-6923
*lina@kaiseylaw.com*

Counsel for Plaintiffs and
the Proposed Classes